**10 CIV 3636**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
MAY - 4 2010
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| FIREFIGHTERS' PENSION SYSTEM OF THE CITY OF KANSAS CITY MISSOURI TRUST, Derivatively and on Behalf of GOLDMAN SACHS, ) ) ) ) ) | |
| Plaintiff, ) | |
| vs. ) | Civil Action No. _____ |
| ) | |
| LLOYD C. BLANKFEIN, GARY D. COHN, JOHN H. BRYAN, CLAES DAHLBACK, STEPHEN FRIEDMAN, WILLIAM W. GEORGE RAJAT K. GUPTA, JAMES A. JOHNSON, LOIS D. JULIBER, LAKSHMI N. MITTAL, JAMES J. SCHIRO AND RUTH J. SIMMONS ) ) ) ) ) ) ) | |
| Defendants, ) | |
| -and- ) | DEMAND FOR JURY TRIAL |
| THE GOLDMAN SACHS GROUP INC., a Delaware corporation, ) ) ) | |
| Nominal Defendant. ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Firefighters' Pension System of Kansas City, Missouri Trust ("Plaintiff" or "Kansas City

Firefighters"), derivatively and on behalf of Nominal Defendant The Goldman Sachs Group, Inc.

("Goldman" or the "Company"), and for its Verified Derivative Complaint against Defendants

herein, alleges the following based upon personal knowledge as to itself and its own acts and upon

information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by

and under the direction of its attorneys, which investigation included a review of press releases and

other public statements made by Goldman, as well as its officers and agents, filings by the Nominal

Defendant with the United States Securities and Exchange Commission ("SEC"), the complaint against Nominal Defendant and FabriceTourre, a registered representative of Goldman by the SEC and other publicly available articles and information about Nominal Defendant and its management in the financial and general press on the Internet.

## NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought by Plaintiff for the benefit of Goldman against Director Defendants, who are certain members of the Company's Board of Directors (the "Board") and certain of its officers. This action seeks to recover for Goldman and its shareholders the millions of dollars of damages caused by Director Defendants' intentional, reckless and/or negligent violations of federal and state law, including breaches of fiduciary and professional duties, statutory violations, acts of gross mismanagement, abuse of control, unjust enrichment and waste of corporate, as well as harm to the Company's reputation and other violations of law.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one intended to confer jurisdiction on a court of the United States that the Court would otherwise lack.

3.      Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including all or primarily all of Defendants' participation in the wrongful acts detailed herein, occurred in this District. One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial

2

compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

    4.    This action arises out of a scheme and course of wrongful conduct whereby Defendants permitted and/or acquiesced to violations of state and federal securities laws resulting in an ongoing investigation and securities fraud enforcement action being filed against the Company by the SEC. Defendants permitted and/or acquiesced to the Company's misrepresentations in the structuring, marketing and selling of a synthetic collateralized debt obligation ("CDO") known as ABACUS 2007-AC1 ("ABACUS"), which was tied to the performance of subprime residential mortgage-backed securities ("RMBS"), without disclosing to investors that Paulson & Co., Inc. ("Paulson"), a large hedge fund and client of Goldman, paid Goldman approximately $15 million for the creation of ABACUS, assisted in the selection of subprime mortgages that made up the reference portfolio for ABACUS, while at the same time, with full knowledge by the Defendants, made huge investments against the very portfolio that it helped the Company to create. In summary, Goldman created a CDO that was designed to fail at the request of Paulson so that it could short the CDO, then allowed Paulson to help select the mortgages that made up the reference portfolio for the CDO, while at the same time sold the CDO to its own customers without disclosing Paulson's role in the transaction. This wrongful course of conduct by Goldman has been criticized by many structured finance experts including Sylvain R. Raynes of R & R Consulting in New York, who characterized this conduct like this: "[t]he simultaneous selling of securities to customers and shorting them because they were going to default is the most cynical use of credit information that I have ever seen. When you buy protection against an event that you have a hand in causing, you are buying fire insurance on someone else's house then committing arson."

5.      Throughout this scheme and course of wrongful conduct, Defendants were aware of, acquiesced in and/or permitted in this unlawful scheme.

6.      As a result of Director Defendants' misconduct, Goldman has sustained millions of dollars in damages and the Company and one of its employees, Fabrice Tourre ("Tourre"), is now the subject of a civil enforcement action brought by the SEC. The Company is also subject to civil liability of over $1 billion as a result of misrepresentations in the marketing and selling of ABACUS. Possible criminal charges may be brought against Goldman as it has been recently reported that the Department of Justice has opened an investigation into the Company's actions. Goldman has suffered attendant damages to its reputation. Further the Company has damaged business relationships with valued clients that it sold ABACUS to thereby damaging business current relationships and future business opportunities which may never be restored.

## PARTIES

### Plaintiff.

7.      Plaintiff, Kansas City Firefighters' Pension is a contributory defined benefit plan established pursuant to the Administrative Code of the City of Kansas City, Missouri. All of the City's fire suppression personnel participate in the Pension System as a condition of their employment. The Pension System has approximately 1,800 active and retired members.

### Nominal Defendant.

8.      Nominal Defendant Goldman is a Delaware corporation with its principal executive offices located at 200 West Street, New York, New York. Goldman is a full services global financial institution organized as a bank holding company and a financial holding company regulated by the Federal Reserve Board, which provides securities related services to a diverse client base including

4

corporations, governments, other financial institutions, and individuals. The Company is segmented into three divisions: Investment Banking, Trading and Principal Investments and Asset Management and Securities Services.

***Background on Goldman***

**Director Defendants**

9.      The biographical information for each of the Director Defendants below has been taken from the Company's Proxy Statement dated May 8, 2009:

10.     Director Defendant Lloyd C. Blankfein has been Chairman and Chief Executive Officer ("CEO") of Goldman since June 2006 and a director since April 2003. Previously, he was President and Chief Operating Officer ("COO") since January 2004. Prior to that, from April 2002 until January 2004, he was a Vice Chairman of Goldman Sachs, with management responsibility for Goldman Sachs' Fixed Income, Currency and Commodities Division (FICC) and Equities Division (Equities). Prior to becoming a Vice Chairman, he had served as co-head of FICC since its formation in 1997. From 1994 to 1997, he headed or co-headed the Currency and Commodities Division. Director Defendant Blankfein is not on the board of any public company other than Goldman Sachs and has not been a director of any other public company in the past five years. He is affiliated with certain non-profit organizations, including as a member of the Dean's Advisory Board at Harvard Law School, the Harvard University Committee on University Resources and the Advisory Board of the Tsinghua University School of Economics and Management, an overseer of the Weill Medical College of Cornell University, and a co-chairman of the Partnership for New York City.

11.     Director Defendant Gary D. Cohn has been President and COO of Goldman since April 2009 and a director since June 2006. Director Defendant Cohn previously was President and

5

Co-COO of Goldman from June 2006 through March 2009. Previously, he had been the co-head of Goldman Sachs' global securities businesses since January 2004. He also had been the co-head of Equities since 2003 and the co-head of FICC since September 2002. From March 2002 to September 2002, he served as co-chief operating officer of FICC. Prior to that, beginning in 1999, Director Defendant Cohn managed the FICC macro businesses. From 1996 to 1999, he was the global head of Goldman Sachs' commodities business. Director Defendant Cohn is not on the board of any public company other than Goldman Sachs and has not been a director of any other public company in the past five years. He is affiliated with certain non-profit organizations, including as a member of the Treasury Borrowing Advisory Committee of the Securities Industry and Financial Markets Association and as a trustee of the Gilmour Academy, NYU Hospital, NYU Medical School, the Harlem Children's Zone and American University.

12.     Director Defendant John H. Bryan, a director of Goldman since November 1999, is the retired Chairman and CEO of Sara Lee Corporation ("Sara Lee"), where he spent more than 25 years overseeing this global consumer products company. He served as Sara Lee's CEO from 1975 to June 2000 and as its Chairman of the Board from 1976 until his retirement in October 2001. Director Defendant. He is not on the board of any public company other than Goldman Sachs. He has been a director of the following public companies in the past five years: BP p.l.c. and General Motors Corporation. He is also the past Chairman of the Grocery Manufacturers of America, Inc. and the past Vice Chairman and a current member of The Business Council. He also served as Co-Chairman of the World Economic Forum's annual meetings in 1994, 1997 and 2000. In addition, Mr. Bryan is affiliated with certain non-profit organizations, including as a Life Trustee of The University of Chicago, as the past Chairman and Life Trustee of the Board of Trustees of The Art Institute of

Chicago, as Chairman of the Board of Directors of Millennium Park, Inc., and as the past Chairman and a current member of The Chicago Council on Global Affairs. He is also the past Chairman of Catalyst.

13.    Director Defendant Claes Dahlbäck a director of Goldman since June 2003, serves as a Senior Advisor to Investor AB, a Swedish-based investment company, and is also a Senior Advisor at Foundation Asset Management, which is owned by three Wallenberg Foundations and which acts as advisor to the Foundations with respect to their holdings. He previously served as Investor AB's nonexecutive Chairman from April 2002 until April 2005, its Vice Chairman from April 1999 until April 2002 and its President and CEO from 1978 until April 1999.  Director Defendant Dahlbäck is not on the board of any public company other than Goldman Sachs. He has been a director of the following public companies in the past five years: Gambro AB and Stora Enso OYJ. Director Defendant Dahlbäck is affiliated with certain non-profit organizations, including as a member of the Royal Swedish Academy of Engineering Sciences and of Naval Sciences, as Honorary Doctor and Director of the Stockholm School of Economics, as Chair of the Leader of the Year Award, as Chair of the Stockholm School of Economics Association and as Commander of the Order of the White Rose of Finland.

14.    Director Defendant Stephen Friedman, a director of Goldman since April 2005, is the Chairman of Stone Point Capital, a private equity firm, since June 2006.  Prior to this he was a Senior Advisor to Stone Point Capital.  He was Chairman of the President's Intelligence Advisory Board and Chairman of the Intelligence Oversight Board from January 2006 to January 2009. He served as Assistant to the President for Economic Policy and Director of the National Economic Council from December 2002 until December 2004. Director Defendant Friedman is also a past Chairman of the

7

Federal Reserve Bank of New York. From 1998 until December 2002, Director Defendant Friedman was a senior principal of MMC Capital, the predecessor of Stone Point Capital. He retired as Senior Partner and Chairman of the Management Committee of The Goldman Sachs Group, L.P., the Company's predecessor, in 1994, having joined the The Goldman Sachs Group, L.P. in 1966. Director Defendant Friedman is not on the board of any public company other than Goldman Sachs and has not been a director of any other public company in the past five years. In addition, he is affiliated with certain non-profit organizations, including as a board member of the Council on Foreign Relations, Memorial Sloan Kettering and The Aspen Institute.

15.     Director Defendant William W. George, a director of Goldman since December 2002, was CEO of Medtronic, Inc. from May 1991 to May 2001 and its Board Chairman from April 1996 until his retirement in April 2002. He joined Medtronic in 1989 as President and COO. Prior to joining Medtronic, he spent ten years as a senior executive with Honeywell International Inc. and ten years with Litton Industries, primarily as President of Litton Microwave Cooking. Director Defendant George is a Professor of Management Practice at the Harvard Business School, where he teaches leadership and leadership development. He was formerly Professor of Leadership and Governance at the International Institute for Management Development from January 2002 until May 2003, Visiting Professor of Technology Management at the École Polytechnique Fédérale de Lausanne from January 2002 until May 2003 and an Executive-in-Residence at the Yale School of Management from September 2003 through December 2003. He has published extensively on leadership and corporate governance issues. Director Defendant George is on the board of one public company in addition to Goldman Sachs: Exxon Mobil Corporation (Board Affairs Committee, Advisory Committee on Contributions and Compensation Committee (Chair)). He has also been a director of the following

public companies in the past five years: Novartis AG and Target Corporation. In addition, he is affiliated with certain non-profit organizations, including as a board member of the World Economic Forum USA and the Guthrie Theater and as a member of the Carnegie Endowment for International Peace.

16.     Director Defendant Rajat K. Gupta, a director of Goldman since November 2006, is Senior Partner Emeritus of McKinsey & Company and Chairman of New Silk Route, a private equity firm, in each case since 2008. He previously served as McKinsey & Company's Worldwide Managing Director from 1994 until 2003 and Senior Partner Worldwide between from 2003 to 2007, and during his tenure oversaw the global expansion of that firm. Prior to that, Director Defendant Gupta held a variety of positions at McKinsey & Company since 1973, where he provided management consulting services across a variety of industries. He advised the chief executive officers and boards of directors at many leading companies on issues related to strategy, organization and operations. Director Defendant Gupta is currently on the boards of the following public companies in addition to Goldman Sachs: AMR Corporation (Audit Committee), Genpact LTD (Chairman of the Board; member of Compensation Committee and Nominating and Governance Committee), Harman International (Nominating and Governance Committee) and Procter & Gamble (Audit Committee and Innovation & Technology Committee). He is also an independent director of Qatar Financial Authority. He is affiliated with certain non-profit organizations, including as Chairman of the Indian School of Business, the Public Health Foundation of India and the Advisory Board of the Gates Foundation, Chairman-elect of the International Chamber of Commerce and Co-Chair of the American India Foundation.

17.     Director Defendant Johnson, a director of Goldman since May 1999, has been a Vice

9

Chairman of Perseus, L.L.C., a merchant banking and private equity firm, since April 2001. From January 2000 to March 2001, he served as Chairman and CEO of Johnson Capital Partners, a private investment company. From January through December 1999, he was Chairman of the Executive Committee of Fannie Mae, having previously served as its Chairman and CEO from February 1991 through December 1998 and its Vice Chairman from 1990 through February 1991. He is on the boards of the following public companies in addition to Goldman Sachs: Forestar Group Inc. (Management Development and Executive Compensation Committee (Chair)), formerly a subsidiary of Temple-Inland Inc., and Target Corporation (Executive Committee, Corporate Governance Committee (Chair), Compensation Committee (Chair) and Corporate Responsibility Committee). He has also been a director of the following public companies in the past five years: Gannett Co., Inc., KB Home, Temple-Inland and UnitedHealth Group Inc. Mr. Johnson is also affiliated with certain non-profit organizations, including as Chairman Emeritus of the John F. Kennedy Center for the Performing Arts, as a member of each of the American Academy of Arts and Sciences, the American Friends of Bilderberg and the Council on Foreign Relations, and as an honorary trustee of The Brookings Institution.

18. Director Defendant Lois D. Juliber, a director of Goldman since March 2004, was a Vice Chairman of the Colgate-Palmolive Company from July 2004 until March 2005. She served as Colgate-Palmolive's COO from March 2000 to September 2004, as its Executive Vice President — North America and Europe from 1997 until March 2000 and as President of Colgate North America from 1994 to 1997. Ms. Juliber is on the board of the following public companies in addition to Goldman Sachs: E. I. du Pont de Nemours and Company (Strategic Direction Committee, Audit Committee (Chair) and Corporate Governance Committee) and Kraft Foods Inc. (Compensation

10

Committee and Public Affairs Committee). She is affiliated with certain non-profit organizations, including as Chairman of The MasterCard Foundation and a trustee of Wellesley College and Women's World Banking.

19.    Director Defendant Lakshmi N. Mittal, a director of Goldman since June 2008, has been Chairman and CEO of ArcelorMittal S.A. since May 2008. He previously served as ArcelorMittal's President and CEO from November 2006 to May 2008. Prior to that, Mr. Mittal was CEO of Mittal Steel Company N.V. (formerly the LNM Group) since 1976, when he founded the company. Director Defendant Mittal is on the boards of the following public companies in addition to Goldman Sachs and ArcelorMittal: European Aeronautic Defence and Space Company EADS N.V. and ICICI Bank Limited.    Additionally, Director Defendant Mittal is affiliated with non-profit organizations, including as a member of the International Business Council of the World Economic Forum, the Advisory Board of the Kellogg School of Management at Northwestern University, the Board of Trustees of Cleveland Clinic, the Executive Committee of World Steel Association and the Executive Board of the Indian School of Business, and as a Golden Patron of The Prince's Trust.

20.    Director Defendant James J. Schiro, a director of Goldman since May 2009, is the former CEO of Zurich Financial Services, a position he held from 2002 until December 2009. He previously served as Zurich's COO — Finance from March 2002 to May 2002. Prior to that, Director Defendant Schiro was CEO of PricewaterhouseCoopers LLP from 1998 to 2002 and Chairman and CEO of Price Waterhouse from 1995 to 1998, having previously held a variety of other positions at

11

Price Waterhouse since 1967. Director Defendant Schiro is on the boards of the following public companies in addition to Goldman Sachs: PepsiCo, Inc. (Audit Committee (Chair)) and Royal Philips Electronics (Corporate Governance and Nomination & Selection Committee). Additionally, Director Defendant Schiro is a director of certain non-profit organizations, including St. John's University, a member of the Advisory Board of the Tsinghua University School of Economics and Management, a trustee of each of the Institute for Advanced Study and the Lucerne Festival, and Vice Chairman of the American Friends of the Lucerne Festival.

21.      Director Defendant Dr. Simmons, a director of Goldman since January 2000, has been President of Brown University since July 2001. She was President of Smith College from 1995 to June 2001 and Vice Provost of Princeton University from 1992 to 1995. Director Defendant Simmons is on the board of one public company in addition to Goldman Sachs: Texas Instruments Inc. Additionally, Director Defendant Simmons is affiliated with certain non-profit organizations, including as a trustee of Howard University and as a member of the American Academy of Arts and Sciences, the American Philosophical Society and the Council on Foreign Relations.

## DUTIES OF DIRECTOR DEFENDANTS

22.      By reason of their positions as officers, directors and/or fiduciaries of Goldman and because of their ability to control the business and corporate affairs of Goldman, the Director Defendants owe and owed Goldman and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, were and are required to use their utmost ability to control and manage Goldman in a

12

fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Goldman and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

23.     Each director and officer of Goldman owes to Goldman the fiduciary duty to exercise due care and diligence in the administration of the affairs of Goldman and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the Defendants have a duty to mange the Company's exposure to litigation and related expenses and damages in order to prevent losses.

24.     In addition, as officers and/or directors of a publicly-held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations so that the market price of the Company's common stock would be based on truthful and accurate information.

25.     The Director Defendants, because of their positions of control and authority as directors an/or officers of Goldman, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements, including marketing materials issued by the Company. Because of their advisory, executive, managerial and directorial positions with Goldman, each of the Director Defendants had access to adverse non-public information about the operations of Goldman, including, without limitation, the fraud and related misconduct in which the Director Defendants caused Goldman to engage.

13

26.    By knowingly engaging in and/or acquiescing in the wrongful conduct complained of

herein, the Director Defendants breached the fiduciary duties that each of them owed to Goldman and

Goldman's shareholders and has caused Goldman to be exposed to hundreds of millions if not more

than a billion dollars in potential civil liability and penalties, an enforcement action brought by the

SEC, as well as other potential legal actions.  Additionally, Goldman has had to and will continue to

incur hundreds of millions of dollars in damages, legal fees and other injuries described more fully

herein.

27.    At all material times hereto, each of the Director Defendants was the agent of each of

the other Director Defendants and of Goldman, and was at all times acting within the course and

scope of said agency.

28.    To discharge their duties, the officers and directors of Goldman were required to

exercise reasonable and prudent supervision over the management, policies, practices and controls

of the financial affairs of Goldman. By virtue of such duties, the officers and directors of Goldman

were required, among other things, to:

> a.    manage, conduct, supervise and direct the business affairs of Goldman in
> accordance with federal and state law and federal rules and regulations and the
> charter and bylaws of Goldman;
>
> b.    neither violate nor knowingly permit any officer, director, or employee of
> Goldman to violate applicable federal laws, rules and regulations and/or state
> law;
>
> c.    establish and maintain systematic and accurate reports and records of the
> business and affairs of Goldman and procedures for the reporting of the

14

business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of said reports and records;

d.    maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Goldman's financial statements and information would be accurate;

e.    exercise reasonable control and supervision over the public statements including marketing ad sells materials provided to the;

f.    exercise reasonable control and supervision over the trading in Goldman by the officers and directors of Goldman;

g.    remain informed as to the status of Goldman operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws; and

h.    supervise the preparation and filing of any audits, reports or other information required by law from Goldman and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Goldman and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

29.    During all relevant times hereto, each of the Director Defendants occupied positions with Goldman or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Goldman. Because of these positions and such

access, each of the Director Defendants knew that the adverse facts specified herein had not been disclosed to and were concealed from the public. The Director Defendants, as corporate fiduciaries entrusted with non-public information, were and are obligated to disclose material, adverse information regarding Goldman and to abstain from trading on such information so as to profit from its misuse.

## CORPORATE DUTIES

30.     The table below illustrates the Director Defendants membership on the three standing committees of the Board during the relevant period of this action.

| Director | Audit Committee | Compensation Committee | Corporate Governance and Nominating Committee |
|---|---|---|---|
| John H. Bryan | ✓ | ✓ | Chair |
| Claes Dahlback | ✓ | ✓ | ✓ |
| Stephen Friedman | Chair | ✓ | ✓ |
| William W. George | ✓ | ✓ | ✓ |
| Rajat K. Gupta | ✓ | ✓ | ✓ |
| James A. Johnson | ✓ | Chair | ✓ |
| Lois D. Juliber | ✓ | ✓ | ✓ |
| Lakshmi N. Mittal | ✓ | ✓ | ✓ |
| James J. Schiro | ✓ | ✓ | ✓ |
| Ruth J. Simmons | | ✓ | ✓ |

***Audit Committee***

31.     According to the Audit Committee's charter the purpose of the Audit Committee includes but is not limited to the following:

16

assist the Board in its oversight of (i) the integrity of the Company's financial statements, (ii) the *Company's compliance with legal and regulatory requirements,* (iii) the independent auditor's qualifications, independence and performance, (iv) the performance of the Company's internal audit function, (v) the Company's internal control over financial reporting, and (vi) the *Company's management of market, credit, liquidity and other financial and operational risks....* (Emphasis added)

32.    Among the many duties and responsibilities of the Audit Committee, it is charged with

the following:

> To discuss with management periodically management's assessment of the Company's market, credit, liquidity and other financial and operational risks, and the guidelines, policies and process for managing such risks.

> To discuss with one of the Company's General Counsel and/or Chief Compliance Officer any significant legal, compliance or regulatory matters that may have a material impact on the Company's business, financial statements or compliance policies.

### Compensation Committee

33.    According to the Compensation Committee's charter the purposes of the

Compensation Committee includes but is not limited to: "determin[ing] and approv[ing] the

compensation of the Company's Chief Executive Officer (the "CEO") and other executive officers...."

34.    Among the many duties and responsibilities of the Compensation Committee, it is

charged with the following:

> In consultation with senior management, to review and approve, or recommend to the Board that it approve, the Company's general compensation philosophy, including the goals and objectives thereof, and to oversee the development and implementation of compensation programs.

> To review and approve the annual compensation of the Company's executives and any new compensation programs applicable to such executives, to make recommendations to the Board with respect to the Company's incentive compensation and equity-based plans that are subject to Board approval, including the Amended and Restated Stock Incentive Plan, the Partner Compensation Plan and the Restricted Partner Compensation Plan, to oversee the activities of the individuals and committees

17

responsible for administering these plans, and to discharge any responsibilities imposed by the Committee by these plans.

### Nominating and Corporate Governance Committee

35.    According to the Corporate Governance and Nominating Committee's charter the purpose of the Corporate Governance and Nominating Committee is to:

> recommend individuals to the Board for nomination, election or appointment as members of the Board and its committees, consistent with the criteria included in the Company's Corporate Governance Guidelines, to oversee the evaluation of the performance of the Board and the Company's Chief Executive Officer ("CEO"), to review and concur in the CEO's and other senior management's succession plans, *and to take a leadership role in shaping the corporate governance of the Company, including developing, recommending to the Board and reviewing on an ongoing basis the corporate governance principles and practices that should apply to the Company.* (Emphasis added)

36.    Among the many duties and responsibilities of the Corporate Governance and Nominating Committee, it is charged with the following:

> To develop and recommend to the Board a set of corporate governance principles and practices applicable to the Company and, at least once a year, to review those principles and practices and recommend to the Board any revisions the Committee deems necessary and desirable.

> To review, at least once a year, the Company's Code of Business Conduct and Ethics and recommend to the Board any revisions the Committee deems necessary and desirable.

### Corporate Governance Guidelines

37.    The Goldman Board has adopted "Corporate Governance Guidelines" which are available on the Company's website. These corporate governance principles have been adopted purportedly "to promote the effective functioning of the Board and its committees, to promote the interests of the shareholders, and to ensure a common set of expectations as to how the Board, its various committees, individual directors and management should perform their functions."

18

38.    The guidelines enumerate numerous responsibilities of the Board including providing

direction and oversight to the Company and managing or directing the business affairs of the

Company in compliance with Delaware law. Also, included among these enumerated responsibilities

of the Board is the following:

> *Reviewing and Approving Significant Transactions.* Board approval of a particular transaction may be appropriate because of several factors, including:

- legal or regulatory requirements
- the materiality of the transaction of the Company's financial performance, risk profile or business,
- the terms of the transaction, or
- other factors, such as the entering into of a new line of business or a variation from the Company's strategic plan.

> To the extent the Board determines it to be appropriate, the Board shall develop standards to be utilized by management in determining types of transactions that should be submitted to the Board for review and approval or notification.

### Goldman Sachs Code of Business Conduct

39.    The Goldman Board has also adopted a "Code of Business Conduct and Ethics," which

is available on the Company's website. This Code of Business Conduct and Ethics purportedly,

> **embodies the commitment of The Goldman Sachs Group, Inc. and its subsidiaries to conduct our business in accordance with all applicable laws, rules and regulations and the highest ethical standards.** All employees and members of our Board of Directors are expected to adhere to these principles and procedures set forth in this Code that apply to them.

> \*        \*        \*

> The Code should be read in conjunction with Our Business Principles which provide in part that, **"Integrity and honesty are at the heart of our business. We expect our people to maintain the high ethical standards in everything the do,** both in their work for the firm and in their personal lives.

> \*        \*        \*

C.    Fair Dealing

We have a history of succeeding through honest business competition. *We do not seek competitive advantage through illegal or unethical business practices. Each employee and director should endeavor to deal fairly with the firm's clients,* service providers, suppliers, competitors and employees. *No employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.*

(Emphasis added)

40.    Also available on the Company's website is further evidence of its purported commitment to the highest legal and ethical standards and its recognition that protecting its reputation was paramount, is the following statement:

**Our assets are our people, capital and reputation**
If any of these is ever diminished, the last is the most difficult to restore. We are dedicated to complying fully with the letter and spirit of the laws, rules and principles that govern us. Our continued success depends upon unswerving adherence to this standard.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

41.    Plaintiff brings this action derivatively in the right and for the benefit of Goldman to redress injuries suffered, and to be suffered, by Goldman as a direct result of the breaches of fiduciary duty, violations of law, gross mismanagement, abuse of control, unjust enrichment and waste of corporate assets, as well as the aiding and abetting thereof, by the Director Defendants. This is not a collusive action to confer jurisdiction on this Court which it would otherwise lack. Goldman is named as a nominal defendant solely in a derivative capacity.

42.    Plaintiff will adequately and fairly represent the interests of Goldman and its shareholders in enforcing and prosecuting its rights.

43.    Plaintiff is and was an owner of the stock of Goldman during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.

20

44.     Given the SEC complaint against Goldman, the present Board of Directors is sterilized from assessing fairly a presuit demand because allowing a derivative claim to proceed would be injurious to the Goldman's position in the companion litigation.

45.     The present Board of Directors consists of twelve members. Plaintiff has not made any demand on the present Board of Directors of Goldman to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the reasons outlined in 46-64 below:

46.     The Goldman Board of Directors and senior officers participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise the wrongs from Goldman stockholders or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein and therefore are not disinterested parties. As a result of their access to and review of internal corporate documents, communications with corporate officers and attendance at management and Board meetings, each director of Goldman had actual or constructive knowledge regarding the misrepresentations in the structuring, marketing and selling of ABACUS.

47.     As a director of Goldman, each Board member had and has specific duties he owed to the Company and its shareholders. In breach of these specific duties, each Board member, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from Goldman's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein. Therefore, members of the Board cannot exercise independent objective judgment in deciding whether to institute or vigorously prosecute this action because each Board member is interested personally in the outcome of such an action, as it is his actions that have played a part in subjecting the Company to millions

21

of dollars in liability for potential violations of applicable securities laws.

48.    In total, the Director Defendants **Blankfein, Cohn and Bryan** sold nearly 430,000 shares of Goldman stock since 2007, receiving almost $72 million in proceeds from these illegal insider sales. Because these Director Defendants received a substantial personal benefit from the challenged insider sales transactions, these Defendants are interested. These Defendants face potential liability for breach of their fiduciary duties not to trade shares of Goldman stock while in possession of adverse material, non-public information. Because these Defendants are interested and have breached their fiduciary duties, any demand upon them clearly would be futile. The insider sales are reflected in the following table.

| Insider Selling Director Defendant | Total # of Shares sold since 2007 | Total Proceeds |
|---|---|---|
| Lloyd C. Blankfein | 215,817 | $36,894,850.13 |
| John H. Bryan | 6,000 | $932,226.00 |
| Gary D. Cohn | 207,319 | $33,829,825.63 |

49.    Director Defendants **Blankfein and Cohn** serve as the Chairman and CEO and the President and COO respectively. As a result of their high-level positions with the Company, they admittedly are not independent under either Company's own Director Independence Standards or the listing standards of the New York Stock Exchange. Because these Defendants are interested and have breached their fiduciary duties, any demand upon them clearly would be futile.

50.    There is almost complete overlap among the three standing committees of the Board (with a single exception, Director Defendant Simmons does not serve on the Audit Committee), each purportedly independent Director Defendant, **Bryan, Dahlback, Friedman, George, Gupta, Johnson, Juiber, Mittal, Schiro, and Simmons** all serve on the Audit, Compensation and Corporate

Governance and Nominating Committees. These committees have no meaningful distinction from the full Board and function to rubber-stamp actions of the full Board, which is dominated by management.

51.    Director Defendants **Bryan, Dahlback, Friedman, George, Gupta, Johnson, Juiber, Mittal and Schiro** serve on the Audit Committee, which allowed the Company to defraud its clients and shareholders in contrivance of their duties to oversee Company compliance with legal and regulatory requirements. Because these Defendants are interested and have breached their fiduciary duties, any demand upon them clearly would be futile.

52.    Director Defendants **Blankfein, Cohn, Bryan, Dahlback, Friedman, George, Gupta, Johnson, Juiber, Mittal, Schiro, and Simmons** having adopted a "Code of Business Conduct and Ethics" for the Company were and are required to ensure adherence to the principles and procedures set out in the Code. Specifically, these Director Defendants were duty bound to ensure that the Company was dealing fairly with its clients and shareholders. However by permitting and/or acquiescing to the misrepresentations in the structuring, marketing and selling of ABACUS, each Director Defendant has breached their fiduciary duties and any demand upon them clearly would be futile.

53.    Director Defendants **Dahlback** advises and has an economic interest in a private equity fund in which subsidiaries of Goldman have maintain an investment in excess of $48 million during the relevant period. Throughout the relevant period Goldman Sachs managed funds made regular capital contributions to the fund in which Director Defendant Dahlback has ownership interest in the amount of $9.7 million in 2007, $6.4 million in 2008 and $5.6 million in 2009, paying in excess of $2.2 million in management fees to Director Defendant Dahlback's fund. As such,

Director Defendant Dahlback is interested and demand upon him would be futile.

54.      Director Defendant **Mittal** is Chairman and CEO of ArcelorMittal, one of the largest steel producers in the world. Director Defendant Mittal owns excess of 40% of the outstanding common stock of ArcelorMittal. ArcelorMittal is a client of Goldman Sachs, receiving financial advisory, lending, investment banking, trading and other financial services from the Company. Over the past decade the Goldman has extended billions of dollars of credit to ArcelorMittal. In fact since 2007, Goldman has participated in providing credit facilities to ArcelorMittal worth in excess of $25 billion. As a result Director Defendant Mittal's company's continued success is dependent on its continued good relationship with Goldman. As such Director Defendant Mittal is interested and demand upon him would be futile.

55.      Director Defendants **Blankfein, Cohn, Bryan, Dahlback, Friedman, George, Gupta, Johnson, Juiber, Mittal, Schiro, and Simmons** will take no action against one another or against any member of the Board because each member of the Board has received millions of dollars in compensation in the form of salary, bonuses, stock options, director fees, charitable contributions and other such compensation (see table below) in exchange for their purported trust, loyalty, fidelity and due care. As illustrative of the lavish compensation each Director Defendant enjoys and is interested in protecting and thus not independent; therefore, making demand upon any of them futile.

*Employee Director Compensation*

| Executive | Year | Salary | Bonus | Stock Award | Option Award |
|---|---|---|---|---|---|
| Lloyd Blankfein Chairman & CEO | 2009 | $600,000 | $0 | $0 | $0 |
| | 2008 | $650,000 | $0 | $23,670,515 | $16,440,188 |
| | 2007 | $600,000 | $26,985,474 | $15,542,756 | $10,453,031 |

| Gary D. Cohn President & COO | 2009 | $600,000 | $0 | $0 | $0 |
|---|---|---|---|---|---|
| | 2008 | $650,000 | $0 | $23,334,671 | $16,200,096 |
| | 2007 | $600,000 | $26,585,474 | $15,245,394 | $10,253,191 |

*Non-Employee Director Total Compensation*

| Director Defendant | 2007 | 2008 | 2009 |
|---|---|---|---|
| John H. Bryan | $695,569 | $338,591 | $476,004 |
| Claes Dahlback | $662,091 | $303,539 | $455,676 |
| Stephen Friedman | $662,091 | $307,715 | $476,004 |
| William W. George | $662,091 | $303,539 | $455,676 |
| Rajat K. Gupta | $662,091 | $303,539 | $450,876 |
| James A. Johnson | $695,569 | $348,591 | $476,004 |
| Lois D. Juliber | $670,091 | $323,539 | $455,676 |
| Lakshmi N. Mittal | ------------ | $151,809 | $450,876 |
| James J. Schiro | ------------ | ----------- | $307,087 |
| Ruth J. Simmons | $667,064 | $323,539 | $450,876 |

56.    The continuation of the remuneration illustrated above and paid by the Company to each Director Defendant  is dependent upon his or her cooperation with the other members of the Board, and his or her participation and acquiescence in the wrongdoing set forth herein, and each member is therefore incapable of exercising independent objective judgment in deciding whether to bring this action.  Because of their association as directors of the Company and their positions as present or former employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment.

57.    In order to bring this suit, all of the directors of Goldman would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

58.    The acts complained of constitute violations of the fiduciary duties owed by Goldman's officers and directors and these acts are incapable of ratification.

26

59.     Any suit by the directors of Goldman to remedy these wrongs would likely expose the Director Defendants and Goldman to further violations of the securities laws, which would result in civil actions being filed against one or more of the Director Defendants and thus they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

60.     Goldman has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Goldman any part of the damages the Company suffered and will suffer thereby.

61.     If Goldman's current and past officers and directors are protected by directors' and officers' liability insurance against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Goldman. Due, however, to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Goldman against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these Director Defendants were to sue themselves or certain of the officers of Goldman, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. In the absence of liability insurance coverage, as would occur if a similar suit were filed by the Company itself, the Director Defendants would not cause Goldman to sue

27

themselves, since they will face a large uninsured liability.

62.    Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by Plaintiff, the Director Defendants have failed and refused to seek to recover for Goldman for any of the wrongdoing alleged by Plaintiff herein.

63.    Further, in the civil enforcement action brought by the SEC against the Company, the Director Defendants have caused the Company to deny the alleged misconduct.  Because the misconduct which serves as the basis for the SEC's complaint against the Company is the crux of this action, for the Director Defendants to pursue this action, the Director Defendants would be forced to have to take inconsistent positions of denying liability in the SEC action and acknowledging the misconduct in this action.  Therefore, because of the conundrum required to simultaneously defend the SEC civil enforcement proceedings and to prosecute this action the Director Defendants have not and will not seek to recover for Goldman for any of the misconduct alleged herein.

64.    Plaintiff has not made any demand on shareholders of Goldman to institute this action since such demand would be a futile and useless act for the following reasons:

        a.    Goldman is a publicly traded company with thousands of holders of record;

        b.    Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

        c.    Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could be individually identified.

## SUBSTANTIVE ALLEGATIONS

65.    On or about February 26, 2007, Goldman finalized the ABACUS pitch book for the

28

CDO. The cover page of the 65-page flip book read: ABACUS 2007 - AC1 $2 Billion Synthetic CDO *Referencing a static RMBS Portfolio Selected by ACA Management, LLC.* ("ACA") (Emphasis Added). The pitch book contained no mention of Paulson.

66.     On or about April 26, 2007, Goldman finalized the offering memorandum for ABACUS. The cover page of this 178-page memorandum describes ACA as "Portfolio Selection Agent." The Transaction Overview, Summary and Portfolio Selection Agent sections of the offering memorandum all contain similar representations that ACA selected the reference portfolio of RMBS, but no where did the offering memorandum contained any mention of Paulson.

67.     It is this failure to disclose and/or misrepresentation of Paulson's role in assisting in the selection of the reference portfolio of RMBS for ABACUS that forms the basis for the wrongful conduct alleged herein, and serves as the crux of the SEC's enforcement proceedings against Goldman.

68.     Not only was the pitch book and offering memorandum misleading, in fact all of the marketing material related to ABACUS was false and/or misleading because it all represented that ACA, a third-party with experience in analyzing credit risk in RMBS, had selected the reference portfolio of 90 RMBS for ABACUS. Neither the pitch book, term sheet, offering memorandum nor any marketing material presented to potential investors in ABACUS make any mention of Paulson's role in assisting in the selection of the reference portfolio or his adverse economic interest in the reference portfolio. To the contrary, investors were led to believe that the party selecting the reference portfolio had economic interests clearly in alignment with there's.

69.     The truth is as early as 2006, Paulson created two funds known as the Paulson Credit Opportunity Funds, which took a bearish view of the subprime mortgage loan market by purchasing protection through CDS, an over-the-counter derivative contract, on various debt securities. Using the

29

CDS, Paulson was basically shorting the subprime mortgage market.

70.     Paulson believed for numerous reasons that certain mid and subprime RMBS rated "Triple B" by Standard & Poors (BBB) and Moody's (Baa2) and even some higher rated tranches would experience credit events.  He wanted to take advantage of this belief by finding a bank that would structure a CDO with a reference portfolio of Triple B rated RMBS, in which he would help to select then bet against the portfolio.

71.     According to Gregory Zuckerman, author of The Greatest Trade Ever, a book detailing Paulson's profitable trading strategy of betting against the housing market, Paulson initially approached a number of bankers, including Scott Eichel, formerly with the now defunct Bear Sterns, asking them to structure and market a synthetic CDO referencing Triple B rated bonds that it had identified for which Paulson could enter into a series of CDS, effectively betting against the reference portfolio that it picked.  Concerned about the ethics of such an investment strategy, Bear Sterns turned Paulson down.  In Zuckerman's book, Eichel is quoted as saying, "'[o]n the one hand, we'd be selling the deals' to investors, without telling them that a bearish hedge fund was the impetus for the transaction... on the other hand, Bear Stearns would be helping Paulson wager against the deals." Eichel went on to say, "it didn't pass the ethics standards; it was a reputation issue, and it didn't pass our moral compass.  We didn't think we should sell deals that someone was shorting on the other side."

72.     Goldman, unlike Bear Stearns, did not concern itself with ethics; it did not concern itself with a conflicts of interests problem of favoring one client at the expense of another of its clients; it did not concern itself reputation risks; Goldman did not concern itself with morals.  Instead, Goldman decided to structure, market and sell a CDO, in which Paulson would assist in the selection

of the reference portfolio. Paulson would bet against the portfolio that he helped select. Goldman would not disclose who selected the reference portfolio, yet Goldman would sell the investments to equity investors.

73.    Goldman and Paulson recognized a diminishing market for the sale of CDOs backed by mortgage related securities as evident by Tourre's January 23, 2007 e-mail in which he writes, translated into English where applicable: "More and more leverage in the system, The whole building is about to collapse anytime now...Only potential survivor, the fabulous Fab[rice Tourre]...standing in the middle of all these complex, highly leveraged, exotic trades he created without necessarily understanding all of the implications of those monstruosities!!!" Similarly, on February 11, 2007, the head of the Company's structured product correlation trading desk in an e-mail to Tourre, said in part, "the cdo biz is dead we don't have a lot of time left."

74.    Realizing that it would be difficult to find investors to place the liabilities of a synthetic CDO if it was known that a short investor like Paulson was participating in the selection of the reference Portfolio, Goldman and Tourre sought to solve this problem by finding an experienced independent third party collateral manager to serve as the reference portfolio selector. More importantly, Goldman knew of one potential investor, IKB Deutsche Industriebank AG ("IKB"), would not likely invest in the liabilities of a CDO that did not utilize a collateral manager to analyze and select the reference portfolio.

75.    Internal Goldman e-mails indicate that Company executives knew not every collateral manager would "agree to the types of names [of RMBS] Paulson want[s] to sue" and put its "name at risk...on a weak quality portfolio." However, in or about January 27, Goldman executives approached ACA about serving as "Portfolio Selection Agent" for a CDO transaction sponsored by Paulson. ACA

was experienced having previously constructed and managed numerous CDOs for a fee.  As of

December 31, 2006, ACA had closed some 22 CDO transactions with underlying portfolios consisting

of $15.7 billion in assets.

76.    According to internal Goldman e-mails and memorandum, the company planned to

prominently feature the fact that ACA was reference portfolio selector.    As an example, Tourre's

February 7, 2007 e-mail stated:

> "One thing that we need to make sure ACA understands is that we want their name on this
> transaction. This is a transaction for which they are acting as portfolio selection agent, this will
> be important that we can use ACA's branding to help distribute the bonds."

Likewise, in a March 12, 2007 internal Company memorandum, Goldman described the marketing

advantages of ACA's "brandname" and "credibility."

> "We expect the strong brand-name of ACA as well as our market-leading position in
> synthetic CDOs of structured products to result in a successful offering."

> "We expect that the role of ACA as Portfolio Selection Agent will broaden the investor
> base for this and future ABACUS offerings"

> "We inteded to target suitable structured product investors who have previously
> participated in ACA-managed cashflow CDO transactions or who have previously
> participate in prior ABACUS transactions."

> "We expect to leverage ACA's credibility and franchise to help distribute this
> Transaction."

77.    Between early January 2007 and February 26, 2007, Paulson, Tourre and ACA

exchanged numerous e-mails and participated in several meetings about the structure of the proposed

transaction and about which RMBS would make up the reference portfolio. However, neither Paulson

nor Tourre disclosed to ACA that the bonds that Paulson would select for inclusion in the reference

32

portfolio would be selected on the basis of their likelihood of failing. Additionally, neither Paulson nor Tourre disclosed to ACA that Paulson was going to take a short position. To the contrary, ACA was led to believe that Paulson was taking an equity position.

78.     On January 10, 2007, Tourre sent an e-mail to ACA that included a description of Paulson as the "Transaction Sponsor" and referenced a "Contemplated Capital Structure" with a "[0]% - [9]%: pre-committed first loss" as part of the Paulson deal structure. The description of this [0]% - [9]% tranche at the bottom of the capital structure was consistent with the description of an equity tranche and ACA reasonably believed it to be a reference to the equity tranche.

79.     On January 12, 2007, Tourre had a phone conversation with ACA about the proposed transaction. Following that conversation, on January 14, 2007, ACA sent an e-mail to the Goldman sales representative with questions about the proposed transaction and referred to Paulson's equity interest. On January 16, the Goldman sales representative forwarded the e-mail to Tourre; therefore, Tourre knew, or was reckless in not knowing that ACA believed that Paulson was taking an equity position in ABACUS.

80.     On January 9, 2007, Goldman sent ACA an e-mail with the subject line, "Paulson Portfolio," which included an attachment with a list of 123 2006 RMBS rated Baa2. ACA performed and "overlap analysis" and determined that it previously had purchased 62 of the 123 RMBS on Paulson's list at the same rating or lower. Paulson, ACA and Tourre exchanged several e-mails and participated in several meetings about the RMBS which would be included in the reference portfolio, and on February 5, 2007, an internal ACA e-mail asked, "Attached is the revised portfolio that Paulson would like us to commit to - all names are at the Baa2 level. The final portfolio will have between 80 and 92 names. Are 'we' ok to say yes on this portfolio?' The response was, "Looks good to me. Did

[Paulson] give a reason why they kicked out all the Well [Fargo] deals?" Wels Fargo was generally perceived as one of the higher-quality subprime loan originators. Finally, on or about February 26, 2007, Paulson and ACA agreed on a reference portfolio of 90 RMBS of ABACUS.

81.    The Goldman Sachs Mortgage Capital Committee, composed of approximately 12 senior-level managerial employees of Goldman approved the ABACUS transaction on or about March 12, 2007, in what has been described as a routine meeting. Interestingly, not a single independent director participated in this approval. Also, the ABACUS transaction was not sent to the Company's Risk Committee. Goldman expected to earn between $15 and $20 million for structuring and marketing ABACUS and Tourre expected to receive substantial incentive compensation for his role in completing the transaction.

**ABACUS INVESTORS**

82.    Tourre and other Goldman executives, employees and agents used false and misleading materials to market ABACUS to several investors, including Goldman clients, ACA Capital Holdings, Inc. ("ACA Capital") ABN Amro and IKB, with out disclosing that Paulson had helped to pick the reference portfolio and at the same time was making significant bets against the reference portfolio. Had any of these investors known the truth about Paulson's role in he investment, they would likely have not invested in ABACUS.

**ACA Capital & ABN Amro**

83.    ACA Capital Holdings, Inc. ("ACA Capitol"), parent company to ACA and unaware of Paulson's short position in the ABACUS transaction, provided financial guaranty insurance on a variety of structured finance products, including RMBS CDOs. On or about May 31, 2007, ACA Capital sold protection or "wrapped" the $909 million super senior tranche of ABACUS, meaning it

assumed the credit risk associated with that portion of the capital structure via a CDS in exchange for premium payments of approximately 50 basis points annually.

84.    ABN AMRO Bank N.V. ("ABN"), one of the largest European banks during the relevant time, intermediated the ACA Capital transaction, meaning that through a series of CDS between ABN and Goldman and between ABN and ACA, ABN netted premium payments of approximately 17 basis points annually. Additionally, this meant ABN assumed the credit risk associated with the super senior position of ABACUS capital structure in the event ACA was unable to pay.

85.    Goldman sent ABN copies of the ABACUS term sheet, flip book and offering memorandum, all of which represented that the RMBS reference portfolio had been selected by ACA and made no mention of Paulson's role in selecting the reference portfolio. Additionally, Tourre in e-mails told ABN that ACA had selected the reference portfolio. The representations and omissions were materially false and misleading because they failed to inform ABN that Paulson played a significant role in selection the reference portfolio and failed to inform ABN that Paulson had a financial interest in the transaction adverse to ACA Capital and ABN.

86.    By the end of 2007, ACA Capital was experiencing financial difficulties, and in early 2008, ACA Capital entered into a global settlement agreement with its counterparties to unwind approximately $69 billion worth of CDSs, approximately $26 billion of which were related to 2005-06 vintage subprime RMBS.

87.    In late 2007, ABN was bought by a consortium of banks that included the Royal Bank of Scotland ("RBS"). On or about August 7, 2008, RBS unwound ABN's super senior position in ABACUS by paying Goldman $840,909,090, most of which subsequently was paid by Goldman to

35

Paulson.

**IKB**

88.    IKB, is a German bank that specialized in lending to small and medium companies. Beginning in or around 2002, IKB, for itself and as an advisor, was involved in the purchase of securitized assets referencing or consisting of, consumer credit risk including RMBS CDOs backed by United States mid and subprime mortgages.

89.    In late 2006, IKB informed Goldman sales representatives and Tourre that it no longer was comfortable investing in liabilities of CDOs that did not utilize a collateral manager with knowledge of the U.S. housing market and expertise in analyzing RMBS. Tourre and Goldman knew that ACA was a collateral manager likely to be acceptable to IKB.

90.    In February, March and April of 2007, Goldman sent IKB copies of the ABACUS term sheet, flip book and offering memorandum, all of which represented that the RMBS reference portfolio had been selected by ACA and made no mention of Paulson's role in selecting the reference portfolio. The representations and omissions were materially false and misleading because they failed to inform IKB that Paulson played a significant role in selection the reference portfolio and failed to inform IKB that Paulson had a financial interest in the transaction adverse to IKB.  To the contrary Tourre and Goldman, through a series of e-mails, led IKB to believe that ACA selected the portfolio, as all of the marketing materials indicated.  For example: on February 19, 2007, a Goldman sales representative forwarded ABACUS marketing material to IKB, explaining, "Attached are details of the ACA trade we spoke about with Fabrice [Tourre] in which you thought the AAAs would be interesting." Additionally, on March 6, 2007, Tourre represented to IKB that, "This is a portfolio selected by ACA..."  Later Tourre would describe the portfolio in an internal Goldman office e-mail as having

36

been "selected by ACA/Paulson."

91.    IKB bought $50 million worth of Class A-1 notes at face value and $100 million worth of Class A-2 notes at face value. Within months of closing , ABACUS Class A-1 and A-2 notes were basically worthless. IKB lost virtually all of its $150 million investment, most of which was ultimately paid to Paulson in a series of transactions between Goldman and Paulson.

92.    As a result of the wrongful conduct described herein, on April 16, 2010, the SEC filed a civil action against Goldman and Tourre for violations of federal securities laws, seeking injunctive relief, disgorgement of profits, prejudgment interest, civil penalties and other appropriate and necessary equitable relief. Consequently, Goldman faces civil liability with respect to the structuring, marketing and selling of ACABUS bond in excess of $1 billion, exclusive of the costs of the investigation and legal defense.    Upon news of the SEC civil enforcement actions, Goldman stock price dropped approximately 12%. Most recently it has been reported that the Department of Justice has opened a criminal investigation into the wrongful conduct alleged herein.  On Friday, April 30, 2010, this news sent Goldman's stock price downward.  Since the first news of Goldman's alleged fraud the company stock price has dropped approximately 20%.

## FIRST CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duty

93.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

94.    As alleged herein the Director Defendants owed and owe Goldman fiduciary duties. By reason of their fiduciary relationships, the Director Defendants owed and owe Goldman the highest obligations of fidelity, trust, loyalty and due care. Additionally, each Director Defendant owed and

37

owes Goldman a duty to ensure that the Company operates in a diligent, fair, honest and equitable manner and complied with all applicable federal and state laws, rules and regulations.

95.    Each of the Director Defendants knew, should have known, or recklessly disregarded that the Director Defendants violated and breached their fiduciary duties of care, good faith, loyalty, reasonable inquiry, oversight and supervision.

96.    Each of the Director Defendants had actual or constructive knowledge of the misrepresentations related to the structuring, marketing and selling of ABACUS, and failed to correct the Company's public misrepresentations and material misstatements and/or omissions. These actions could not have been in a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

97.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary duties the Company has suffered significant damages.

98.    As a direct and proximate result of the misconduct alleged herein, the Director Defendants are liable to the Company.

### SECOND CAUSE OF ACTION

**Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

99.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

100.    At the time of the stock sales by the Insider Selling Defendants set forth herein, each Insider Selling Defendant knew or should have known of the illegal and unethical manner in which the company structured, marketed and sold ABACUS.

38

101.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's was misrepresenting and otherwise concealing the truth about ABACUS. The Insider Selling Defendants' sales of the Company's common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of good faith and loyalty.

102.    Because the Insider Selling Defendants' use of the Company's proprietary information for their personal gain constitutes a breach of the Insider Selling Defendant's fiduciary duties, Goldman is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### THIRD CAUSE OF ACTION

#### Against All Director Defendants for Gross Mismanagement

103.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

104.    By their actions and/or inaction alleged herein, the Director Defendants, directly, indirectly, knowingly, willfully and/or intentionally through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary obligations with regard to the prudent management of Goldman in a manner consistent with the operations of a public company.

105.    As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Goldman has sustained significant damages.

106.    As a direct and proximate result of the misconduct and breaches of fiduciary duty alleged herein, the Director Defendants are liable to the Company.

### FOURTH CAUSE OF ACTION

#### Against All Director Defendants for Abuse of Control

39

107.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

108.    The Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Goldman, for which they are legally responsible.

109.    As a result of the Director Defendants' abuse of control, Goldman has sustained significant damages.

110.    As a direct and proximate result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## FIFTH CAUSE OF ACTION

### Against All Director Defendants for Unjust Enrichment and Waste of Corporate Assets

111.    Plaintiff incorporates by reference and alleges each and every allegation containedabove, as though fully set forth herein.

112.    As a result of the Director Defendants' foregoing conduct, the Director  Defendants have caused Goldman to waste valuable assets and have subjected the Company to potential civil penalties and material liability for securities fraud, possibly reaching in excess of a billion dollars in damages, as well as significant legal defense fees.

113.    As a result of the Director Defendants' conduct described herein and as a result of the huge profits realized in illegal insider trading by the Insider Selling Defendants and the huge profits realized in bonuses and other compensation by the Director Defendants, all of the Director Defendants have been unjustly enriched and/or aided and abetted in the unjust enrichment of the other Director Defendants at the expense of Goldman and its shareholders.

114.    The Director Defendants should be required to disgorge the gains which they will obtain or have unjustly obtained at the expense of Goldman and its shareholders. A constructive trust for the benefit of Goldman and its shareholders should be imposed upon those proceeds.

115.    As a direct and proximate result of the Director Defendants' unjust enrichment and waste of corporate assets Goldman has sustained significant damages.

116.    As a direct and proximate result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring that the Director Defendants, and each of them, have committed breaches of their fiduciary duties to Goldman;

B.    Requiring the Director Defendants to pay Goldman the amounts by which the Company has been damaged by reason of the conduct complained herein;

C.    Requiring restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

E.    Granting extraordinary equitable and/or injunctive relief as permitted by law or equity for the Defendants' breaches of fiduciary duties; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 3 2010

41

Respectfully submitted,

**ROY JACOBS & ASSOCIATES**

_____
Roy L. Jacobs (A member of the Bar of this Court)
One Grand Central Place
60 East 42nd Street 46th Floor
New York, NY 10165
Phone: (212) 867-1156
Fax: (212) 504-8343
rjacobs@jacobsclasslaw.com

CARNEY WILLIAMS BATES BOZEMAN & PULLIAM, PLLC
Darrin Williams
11311 Arcade Dr., Suite 200
Little Rock, AR 72211
Phone: (501) 312-8500
Fax: (501) 312-8505

## VERIFICATION OF LOUIE WRIGHT, CHAIRMAN FIREFIGHTERS' PENSION SYSTEM OF THE CITY OF KANSAS CITY, MISSOURI TRUST

I am Louie Wright, Chairman of the Board of Trustees for the Firefighters' Pension System of the City of Kansas City, Missouri Trust. The Kansas City Firefighters' Pension Fund is a contributory defined benefit plan established pursuant to the Administrative Code of the City of Kansas City, Missouri. The Kansas City Firefighters' Pension Fund is governed by a seven member board of trustees. All of the City's fire suppression personnel participate in the Pension System as a condition of their employment. As Chairman of the Firefighters' Pension System of the City of Kansas City, Missouri Trust, I declare as follows:

1.    The Firefighters' Pension System of the City of Kansas City, Missouri Trust is a shareholder now and during the relevant times of the allegations alleged herein against The Goldman Sachs Group, Inc.

2.    I have read the foregoing complaint and know the contents thereof. Based on the research and investigation by Carney Williams Bates Bozeman & Pulliam, PLLC ("Carney Williams"), I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

3.    Carney Williams has been authorized to file this derivative action against certain officers and directors of The Goldman Sachs Group, Inc.

Executed this **29**th day of April, 2010, Kansas City, Missouri

LOUIE WRIGHT, CHAIRMAN
Firefighters' Pension System of the City of
Kansas City, Missouri Trust